## A09A0629. ARMSTRONG v. THE STATE.
(681 SE2d 662)

PHIPPS, Judge.

In connection with a traffic stop of his sports utility vehicle (SUV), Walter Philscott Armstrong was charged with driving while

---

his license was suspended, operating a motor vehicle without his driver's license in his immediate possession, and possession of methamphetamine with the intent to distribute. Armstrong pled guilty to the traffic charges and was tried on the drug charge jointly with the two passengers in his SUV at the time of the stop, Tiffany Dover and Candelario Escobar. The jury found the three co-defendants guilty of possession of methamphetamine with the intent to distribute. In this appeal, Armstrong challenges the sufficiency of the evidence to support his drug conviction, and he contends that the trial court erred by rejecting his claim that he was deprived of the assistance of counsel at his sentencing hearing. For reasons that follow, we affirm.

1. When an appellant challenges the sufficiency of the evidence to support his conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[1] The appellant no longer enjoys a presumption of innocence, and an appellate court determines only the legal sufficiency of the evidence and does not weigh the evidence or assess the credibility of the witnesses.[2]

Shortly after 10:00 p.m. on June 26, 2006, a patrolman with the Bartow County Sheriff's Office was notified by narcotics agents that an SUV suspected of being used for illegal activity was traveling without a working headlight on a highway in Taylorsville. The patrolman spotted the SUV, which was towing an uncovered, loaded six- or eight-foot utility trailer. He stopped the vehicle for failure to maintain a single lane of traffic.

Armstrong was in the driver's seat of the SUV; Escobar was in the front passenger seat; and Dover was in the back seat. When the officer approached Armstrong, he detected a strong odor of alcohol. Armstrong could not produce his driver's license, and the officer discovered that it was suspended. Armstrong was arrested. The officer also determined that the SUV belonged to Armstrong and obtained his consent for a search of the vehicle.

By this time, other law enforcement officers had arrived at the scene. The two passengers exited the SUV, and several officers began searching it. Two open, cold containers of alcoholic beverages were in the compartments where the passengers had been sitting. The two passengers were told they were being arrested for open container violations.

---

[1] *Selfe v. State*, 290 Ga. App. 857, 858 (1) (660 SE2d 727) (2008) (emphasis omitted), quoting *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979).

[2] *Segel v. State*, 293 Ga. App. 506 (1) (667 SE2d 670) (2008).

All of the arrestees were told further that they would be searched at the jail and that transporting contraband across a certain point at the jail would lead to an additional charge. Dover then volunteered that she wanted to make a statement. After being read *Miranda* warnings, she pulled out of her pants two pipes for smoking and a plastic bag containing what appeared to be methamphetamine. According to an officer at the scene, Dover claimed that when they were stopped, Armstrong handed her one of the pipes and Escobar handed her the bag and the other pipe. Armstrong, Dover, and Escobar were then advised that they were being charged also for possession of methamphetamine with the intent to distribute. The substance in the bag tested positive for methamphetamine and weighed 12.27 grams, plus or minus 0.03 grams. The pipes were not tested.

During booking, $600 was removed from Escobar's person, and urine samples were collected from Armstrong, Dover, and Escobar. Armstrong's sample contained a metabolite of marijuana that showed that he had ingested marijuana within the last two days, but it tested negative for amphetamine and methamphetamine. Dover's sample contained d-amphetamine, 1-amphetamine, and 1-methamphetamine; it tested negative for marijuana. And Escobar's sample contained d-methamphetamine, 1-methamphetamine, d-amphetamine, and 1-amphetamine.

Armstrong did not testify at their trial, but Dover and Escobar did. Dover recounted that, prior to the date in question, Armstrong occasionally lived with her. She had met Escobar through Armstrong about a week before the incident underlying this case. Dover testified that Escobar's nickname was "Candy" and that "he was the Candyman," which term she equated to "dopeman." On the date in question, Armstrong was moving to Tennessee, and she had been assisting him in loading various items onto the trailer, but they needed help to lift heavy items. Dover suggested that they call Escobar, and Armstrong placed the call. Dover conceded at trial, however, that they had called on Escobar because they wanted also to "get high."

The two of them drove from Acworth to the Marietta area, where they picked up Escobar at his residence. But Escobar did not have any drugs. They drove to a gas station near Escobar's residence. Only Escobar got out of the SUV; he sat in another vehicle with someone else for less than ten minutes, and then returned with methamphetamine to Armstrong's SUV.

Dover recalled that they next drove to her grandfather's friend's house in Acworth so that she could borrow $200, testifying that Armstrong needed the money for his child support obligation. While sitting in the wooded driveway of that residence, she, Armstrong,

YALE LAW LIBRARY

and Escobar used two pipes to smoke about two grams of the methamphetamine that Escobar had obtained from the person at the gas station. She described that Escobar had passed to her a pipe with the drug already in it. Dover recalled going into the house alone, returning to the SUV with $200, and handing the money to Armstrong.

From there, the three of them drove to another residence, where only Armstrong got out of the SUV and went inside. Armstrong did not come out until about an hour later.

Next, Armstrong, Dover, and Escobar went to another gas station, where Armstrong purchased alcoholic beverages for Dover. Minutes after leaving the gas station, they were stopped by law enforcement. Dover testified that Escobar quickly tossed in her lap the bag of methamphetamine and both pipes (as opposed to an officer's testimony that Dover claimed at the scene that Armstrong had given her one of the pipes) and told her to hide the items. She concealed them in her pants, but after being told that transporting contraband across a certain point in the jail house would lead to an additional charge, she revealed the items to law enforcement.

Dover admitted that she had started using methamphetamine at age 13, that she had been convicted in 2003 of methamphetamine possession, and that around the time of the incident underlying this case, she was 26 and addicted to methamphetamine.

Escobar's account of his involvement with the methamphetamine differed from that of Dover. On the date in question, Armstrong called him; they did not discuss moving any items, but agreed to go out to drink beer because Escobar had gotten paid at his construction job earlier that day. After Armstrong and Dover picked him up, their first stop was at a residence. Escobar recalled that it was during their ride to that residence that Armstrong pulled out a pipe with methamphetamine in it and the three of them passed the pipe to smoke the drug. Once at the residence, only Dover went inside. Escobar did not see her with any cash when she returned to the SUV. After leaving that residence, they went to another residence, where only Armstrong went inside. After Armstrong returned to the SUV, the three of them went to a gas station to purchase alcoholic beverages. And after leaving there, they were stopped by law enforcement.

Escobar denied knowing at the time they were stopped that there was a bag of methamphetamine in the SUV. He denied that he had left Armstrong's SUV at a gas station to sit momentarily in someone else's vehicle. And he denied giving the methamphetamine and the pipes to Dover. Further, Escobar explained that he was called

"Candy" because his "short name [was] Cande."[3]

Regarding the $600 found on him during booking, Escobar explained that he had earned the money at his construction job, which paid him $100 in cash for each day worked, which was up to six days a week. He further explained that at the time of the incident, he did not have a bank account.

The indictment charged that Armstrong had violated OCGA § 16-13-30 in that he had, "as part[y] to a crime, OCGA § 16-2-20, possess[ed], with intent to distribute, methamphetamine." OCGA § 16-13-30 makes it unlawful for any person to "possess with intent to distribute any controlled substance."[4] " 'Distribute' means to deliver a controlled substance, other than by administering or dispensing it."[5] And " '[d]eliver' . . . means the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship."[6]

Armstrong argues on appeal that the evidence failed to show that he was in possession of the drug and failed to show that he intended to distribute it. He claims that, with respect to him, the evidence showed that he was merely present in the SUV where there also was methamphetamine. Armstrong asserts that the test results showed that only his co-defendants had been in possession of the drug. In addition, he cites the evidentiary conflict regarding whether he had given Dover one of the two pipes she revealed to law enforcement. Further, Armstrong points out that no tests were conducted to determine whether either pipe had been used to smoke methamphetamine. And he claims that the state failed to show any drug transaction, citing Dover's testimony that he had $200 when he was arrested, pointing out that there was no evidence of what had occurred inside the residence where he visited without Dover and Escobar, and asserting that there was no evidence of any large amounts of cash, scales, or packaging of the drug for resale. Armstrong also posits that evidence of "12 grams of methamphetamine, divided between three passengers" was insufficient to establish circumstantially the requisite intent element.

Armstrong disregards, however, that OCGA § 16-2-20 authorizes a conviction for a crime if the defendant was "concerned in the commission" of the crime. A person is concerned in the commission of a crime when he, among other ways, "[d]irectly commits the

---

[3] When asked for his full name at the start of his testimony, Escobar responded "Candelario Escobar Alvarez."

[4] OCGA § 16-13-30 (b).

[5] OCGA § 16-13-21 (11).

[6] OCGA § 16-13-21 (7).

crime"[7] or "[i]ntentionally aids or abets in the commission of the crime."[8] The record shows that the jury was instructed on these two ways. And the record shows that, in responding to the defense motion for directed verdict, the prosecutor revealed that the state's theory centered around Armstrong's intentional use of his SUV in the commission of the crime.[9]

"[E]vidence of mere presence at the scene of the crime, and nothing more to show participation of a defendant in an illegal act, is insufficient to support a conviction."[10] But in this case, there was more. The evidence showed that Armstrong was the owner of and in control of the SUV at all relevant times. It further authorized a finding that Armstrong knew that Dover, who had a methamphetamine addiction, wanted to "get high"; that he contacted Escobar at least in part because he knew that Escobar could provide drugs; that after speaking with Escobar, Armstrong drove his SUV to pick up Escobar, then took Escobar to his supplier of methamphetamine; that after Escobar procured the methamphetamine, Armstrong drove to a residence so that Dover could get cash; and while at the residence, Escobar supplied her with some of the methamphetamine that he had procured moments earlier.

"Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support a verdict[,] and the sufficiency of the corroborating evidence is for the trier of fact to decide."[11] Dover's testimony that she had recently ingested methamphetamine was corroborated by the results of testing upon her urine sample. Her testimony that Armstrong had provided the transportation that facilitated the procurement of the methamphetamine she ingested was corroborated with evidence that Armstrong was the owner of the SUV and was in the driver's seat at the time of the traffic stop. Dover's account characterizing Escobar as a methamphetamine dealer who had just purchased the drug was corroborated by a narcotics agent called by the state. The agent testified that the condition of the confiscated methamphetamine — that it had not been broken down into "individual sale components" — showed that it had recently been sold to a street-level dealer. According to the agent, a common quantity sold by a street-level dealer to a user is one gram, and a gram

---

[7] OCGA § 16-2-20 (b) (1).

[8] OCGA § 16-2-20 (b) (3).

[9] However, neither opening statements nor closing arguments were transcribed.

[10] *Locklear v. State*, 249 Ga. App. 104, 105 (547 SE2d 764) (2001) (citations and punctuation omitted).

[11] *Judkins v. State*, 282 Ga. 580, 581-582 (1) (652 SE2d 537) (2007) (citation and punctuation omitted).

generally costs $80 to $100. Further, the agent testified that street level dealers have been found to have on their persons over $500 to $800. The jury was not required to believe Dover's claim as to the purpose of the $200 she borrowed; nor was the jury required to believe Escobar's claim as to the source of the $600.[12]

Notwithstanding Armstrong's claim that the state's case contained evidentiary weaknesses and conflicts, the evidence authorized a finding that he was guilty as charged.[13]

2. Armstrong contends that the trial court erred by rejecting his claim that he was deprived of his Sixth Amendment right to counsel at his sentencing hearing. Armstrong was represented at trial by a lawyer with a public defender's office, and he complains that this lawyer did not attend his sentencing hearing.

> It is a well-established rule that a defendant has a right to appointed counsel at any critical stage of proceedings brought against him. It is equally established that sentencing ... is such a critical stage at which a defendant is generally entitled to be present ... and to be represented by counsel.[14]

At the start of Armstrong's sentencing hearing, another attorney from the same public defender's office reported to the court that, because Armstrong's trial attorney was in a murder trial, he would be representing Armstrong for purposes of the sentencing hearing. Armstrong has not argued that the lawyer who represented him during the sentencing hearing performed deficiently. He merely asserts that, without "his" lawyer, he was at a "disadvantage." "The essential aim of the Sixth Amendment is to guarantee effective assistance of counsel, not to guarantee a defendant preferred counsel or counsel with whom a 'meaningful relationship' can be established."[15] Under the circumstances presented here, Armstrong has

---

[12] *Mickens v. State*, 277 Ga. 627, 629 (593 SE2d 350) (2004) (the jury determines the credibility of the witnesses and resolves evidentiary conflicts or inconsistencies and is authorized to disbelieve testimony of witnesses).

[13] See generally *Navarrete v. State*, 283 Ga. 156, 158 (1) (656 SE2d 814) (2008) (while mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during and after the offense); *Baines v. State*, 276 Ga. 117, 119 (1) (575 SE2d 495) (2003) ("Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support a verdict ... [, and] [t]he sufficiency of the corroborating evidence is for the trier of fact to decide.") (citations and punctuation omitted); *Russell v. State*, 289 Ga. App. 789, 790-791 (1) (658 SE2d 400) (2008).

[14] *Robertson v. State*, 280 Ga. 885, 886 (635 SE2d 138) (2006).

[15] *Smith v. State*, 273 Ga. 356, 358 (3) (541 SE2d 362) (2001) (citation and punctuation omitted).

shown no merit in his contention that the trial court erred by rejecting his claim.[16]

*Judgment affirmed. Smith, P. J., and Bernes, J., concur.*

DECIDED JULY 9, 2009.

*Vaughan & Evans, Donald C. Evans, Jr.,* for appellant.

*T. Joseph Campbell, District Attorney, Gregory S. Dickson, Assistant District Attorney,* for appellee.